UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
LUCITA URENA and JOSE URENA,

                    Plaintiffs,

      - against -

CONAGRA FOODS, INC. and DS
CONTAINERS, INC.,

                  Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
16-CV-5556 (PKC) (LB)

PAMELA K. CHEN, United States District Judge:

Plaintiffs Lucita Urena ("Lucita") and Jose Urena ("Jose") bring this action asserting design defect and failure to warn claims[1] against Defendants ConAgra Foods, Inc. ("ConAgra") and DS Containers, Inc. ("DS Containers") (collectively "Defendants"), stemming from injuries that occurred on August 16, 2016, when Lucita was burned by a can of PAM that exploded while she was cooking. Jose also brings a claim for loss of consortium due to his wife Lucita's injuries. Currently before the Court are Defendants' joint motions to exclude Plaintiffs' expert Dr. Lester Hendrickson under *Daubert*[2] (Dkt. 85) and a dispositive motion for summary judgment on all of Plaintiffs' claims (Dkt. 89). Defendants also ask that, in the event the Court denies summary judgment, Plaintiffs' claims be dismissed as a remedy for spoliation.

For the following reasons the Court grants Defendants' *Daubert* and summary judgment motions in full and dismisses this case.

---

[1] As discussed *infra*, Plaintiffs initially brought additional claims against these and additional Defendants, all of which have been voluntarily dismissed.

[2] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) (outlining standard for determining the admissibility of scientific evidence under the Federal Rules of Evidence).

# BACKGROUND

## I.   Facts[3]

Plaintiffs contend that, on August 16, 2016, Lucita "was burned when a can of PAM 'exploded' in her hand while she was cooking in her apartment." (Plaintiffs' 56.1 Response ("Pls.' 56.1"), Dkt. 96, ¶ 7; *see also* Photographs of the Subject Can, Dkt. 98-1, at ECF[4] 41–42, 45–46.) The can at issue in this lawsuit "is a container of PAM Original cooking spray (12 oz.), which was sold in a '211 x 713' bottom-vented containe[r] (or 'vented can')." (Pls.' 56.1, Dkt. 96, ¶ 1.) ConAgra sold the PAM product, and DS Containers manufactured the can itself. (*Id.*) The can contained four U-shaped score lines designed to open when the pressure inside the can rose to a particular level, "causing the bottom end to buckle outwards or 'evert,'" allowing the contents inside to rapidly escape. (*Id.* ¶ 2.) The parties dispute the pressure required to cause the bottom of the can to buckle, and the use of the word "vent" to describe that buckling. (*Compare id. with*, Defs.' 56.1, Dkt. 90, ¶ 2.)

---

[3] Unless otherwise noted, a standalone citation to a party's 56.1 statement denotes that this Court has deemed the underlying factual allegation undisputed. Any citation to a party's 56.1 statement incorporates by reference the documents cited therein. Where relevant, however, the Court may cite directly to the underlying document. The Court has deemed facts averred in a party's 56.1 statement to which the opposing party cites no admissible evidence in rebuttal as undisputed. *See Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 12, 2012) ("Eastern District Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything." (emphasis in original)). Additionally, to the extent a party's 56.1 statement "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts," the Court has disregarded the statement. *Risco v. McHugh*, 868 F. Supp. 2d 75, 87 n.2 (S.D.N.Y. 2012).

[4] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

At her deposition, Lucita testified that, on the evening of the explosion, she was preparing dinner and allowed multiple items to simmer in oil, with the three of the four gas burners of her stove "on low" for five to ten minutes.  (Pls.' 56.1, Dkt. 96, ¶ 8.)  When she went to cook an egg on the remaining right, front burner she retrieved a new frying pan and tried to spray PAM into the frying pan.  (*Id.* ¶¶ 8, 10.)  When she attempted to do so, the PAM can exploded, and she was burned.  (*Id.* ¶ 10.)  The parties dispute whether Lucita knows if any spray actually exited the can.  (*Compare* Deposition of Lucita Urena ("Lucita Dep."), Dkt. 101-1, at 211:3–12:4 (Lucita testifying that the "spray came out" and she felt the oil "[on] everything"), *with* Defendants' 56.1 Statement ("Defs.' 56.1"), Dkt. 90, ¶ 11 (positing that Lucita's testimony indicates that she did not know whether any spray left the can[5]).)  Although Lucita believes she "got burned" as a result of the explosion, she is not sure "if [it was] because of the fire or the can," or "something else like hot oil."  (Lucita Dep., Dkt. 101-1, at 101:12–19.)  Lucita claims that she was burned "[e]verywhere.  Everywhere.  My entire body.  My entire body."  (*Id.* at 107:12–13; *see also id.* at 104:6–8 ("I saw my arms, my face.  I felt heat in me.  I started to scratch my entire arm.  My skin was coming off."); *id.* at 125:5–23 (indicating that her right arm was burned, in addition to her "entire face").)

---

[5] At her deposition, Lucita testified:

> The can exploded when I was going to use it. . . .  [The incident occurred] [w]hen I squeezed the can. . . .  That's when the accident happened.  So I don't know if it came out or not, because when I squeezed it, that's when it happened there. . . .  [At the time of the incident] I was grabbing [the frying pan] with my hand, and I moved a little bit, and then I was going to put the spray in, and that's when the accident happened.

(Lucita Dep., Dkt. 101-1, at 82:2–85:20.)

At the time of the explosion, Lucita also saw fire coming from the stove area. (Pls.' 56.1, Dkt. 96, ¶ 12.) The can was not hot when she was holding it, but "it was a hundred degrees that day, both outside and in her apartment." (*Id.* ¶ 13.) After the incident, Jose took Lucita to the shower, and then put out the flames in the kitchen. (*Id.* ¶ 16.) At that time, he was able to smell gas coming from the stove area. (*Id.*) A fire investigation was not conducted, and there is no opinion, outside of Jose's testimony, as to the cause of the fire.[6] (*Id.* ¶ 17.)

The subject can "include[d] several warnings and directions for use to prevent the user from allowing the can to overheat," including:

> USE ONLY AS DIRECTED. FLAMMABLE. DO NOT SPRAY ON HEATED SURFACES OR NEAR OPEN FLAME. NEVER SPRAY DIRECTLY INTO OVEN. REMOVE BROILER PANS FROM OVEN BEFORE SPRAYING. CAN MAY BURST IF LEFT ON STOVE OR NEAR HEAT SOURCE. AVOID SPRAYING IN EYES. CONTENTS UNDER PRESSURE. DO NOT PUNCTURE OR INCINERATE. DO NOT STORE ABOVE $120^0$ F. KEEP OUT OF REACH OF CHILDREN.

(Defs.' 56.1, Dkt. 90, ¶ 5.)

## II.   Procedural History

Plaintiffs filed this case on October 5, 2016 against Defendant ConAgra and BJ's Wholesale Club, Inc., asserting strict liability claims for design defect, manufacturing defect, and failure to warn; a breach of express warranty and implied warranty of fitness and merchantability claim; and negligence. (*See generally* Complaint ("Compl."), Dkt. 1.) Plaintiff Jose Urena also filed a claim for loss of consortium. (*Id.* ¶¶ 97–100.)

Following a February 15, 2017 pre-motion conference regarding Defendant ConAgra's anticipated motion to dismiss (*see* Feb. 15, 2017 Minute Entry), Plaintiffs filed a letter with the

---

[6] "Defendants' fire-cause-and-origin expert, Dr. Ogle, explained that the failure to properly document, analyze, and preserve the scene necessitates that the fire be categorized as 'undetermined' in cause." (Defs.' 56.1, Dkt. 90, ¶ 21 (record citations omitted).)

4

Court on March 9, 2017 withdrawing their claims for breach of express warranty (Dkt. 18), which allowed the Court to dismiss Count 2(A) of the Complaint (Mar. 10, 2017 Order).  On May 10, 2017, the Honorable Lois Bloom, Magistrate Judge, granted Plaintiffs' motion to formally amend their complaint to "reflect[] the accurate date of purchase of the subject cooking spray can" and to add Full-Fill Industries, LLC and DS Containers as Defendants.[7]  (*See* May 10, 2017 Order.)

On October 19, 2017, Judge Bloom held a telephone status conference to discuss, *inter alia*, the fact that after the parties' recent inspection of the PAM container at issue, "the container, which was in [P]laintiffs' counsel's possession, was left in a conference room and discarded." (Oct. 19, 2017 Minute Entry.)  The cannister was apparently discarded by custodial staff after being left in the conference room, and was destroyed "before any expert could analyze it."  (Defs.' 56.1, Dkt. 90, ¶ 20; *see also* Pls.' 56.1, Dkt. 96, ¶ 20 (admitting the fact of spoliation "except it should be noted that photographs taken of the subject can were authenticated by [Lucita] at her deposition.  Moreover[,] . . . defense counsel had the opportunity to inspect and photograph the subject PAM canister prior to its inadvertent disposal." (internal record citations omitted)).)  On October 27, 2017, Judge Bloom held another telephone status conference during which she directed "[P]laintiffs' counsel [to] speak to [P]laintiffs about the impact of the discarded PAM container on this litigation."  (Oct. 27, 2017 Order.)  Following a joint status report filed by Defendants on December 18, 2017 (Dkt. 58), Judge Bloom issued an order noting her "dismay[]" over Plaintiffs' counsel's "failure to comply with this Court's order to speak to his client about the discarded PAM container" and that "[d]iscovery has proceeded without [P]laintiffs' knowledge of

---

[7] There were also a number of crossclaims asserted in this case, all of which have been dismissed via stipulation.  (*See, e.g.*, Dkts. 9, 35, 47, 53.)

what has transpired" (Dec. 19, 2017 Order).  On January 3, 2018, Plaintiffs' counsel filed a letter with the Court confirming that he had informed Plaintiffs about the loss of the can.  (Dkt. 59.)

On February 16, 2018, Defendants filed a request for a pre-motion conference regarding anticipated motions for summary judgment and spoliation (Dkt. 63), which this Court granted (Feb. 26, 2018 Order).  At that conference on March 8, 2018, the Court denied Defendants' request to file motions at that time, with leave to renew, following the conclusion of expert discovery. (Mar. 8, 2018 Minute Entry.)  Following the completion of expert discovery, Defendants renewed their motion on January 7, 2019 (Dkt. 74), and the Court set a briefing schedule during a pre-motion conference held on February 28, 2019 (Feb. 28, 2019 Minute Entry).

On April 8, 2019, Defendants wrote to the Court asking for an extension, and explaining that at the pre-motion conference, Plaintiffs' counsel "admitted" that he did not see a path for success for a manufacturing defect claim, nor could he "think of" "any basis on which to keep Defendants [BJ's] Wholesale Club and Full-Fill Industries, LLC in the case."  (Dkt. 77 (record citations omitted).)  The Court ordered Plaintiffs to file a letter "indicating which claims they intend[ed] to withdraw," noting that they had failed to comply with the previously set deadline. (Apr. 9, 2019 Order.)  On April 10, 2019, Plaintiffs filed a stipulation for dismissal with prejudice voluntarily dismissing all claims against BJ's Wholesale Club, Inc. and Full-Fill Industries, LLC, and all claims based on manufacturing defects, breach of implied warranty, and negligence against ConAgra and DS Containers.  (Dkt. 78.)  Plaintiff's counsel wrote: "It [was] the intent of the Parties that Plaintiffs' remaining claims are limited to theories based on an alleged design defect or failure to warn, and not based on an alleged manufacturing defect."  (*Id.*)  On July 22, 2019, the remaining Defendants' motions for summary judgment and *Daubert* motion were fully briefed. (*See* Dkts. 84–91, 93–100.)

On January 15, 2020, the Court held oral argument on Defendants' motions and an evidentiary hearing relating to Defendants' *Daubert* motion.  Plaintiff's expert witness, Dr. Lester Hendrickson, testified at the hearing via video conference and was subjected to questioning by the parties' counsel and the Court.  (*See generally* Jan. 15, 2020 Transcript ("Tr."), Dkt. 107.)

## III.   Expert Submissions and the *Daubert* Hearing

### A.   Dr. Robert C. Sugarman

In connection with this lawsuit, Plaintiffs' counsel retained an expert, Robert C. Sugarman, Ph.D., to opine about the adequacy of the warnings on the PAM cannister at issue.  (*See* Expert Report of Dr. Robert Sugarman ("Sugarman Rep."), Dkt. 98-2, at ECF 8 (describing task as reviewing "the human factors issues, including warnings on the product involved in the accident . . . in which a can of PAM vented its contents causing a fire and serious injuries to Mrs. Lucita Urena").)  Dr. Sugarman reviewed, *inter alia*, the depositions of Plaintiffs; photos of Lucita after the accident, the PAM container, and the kitchen; "alternate label details venting process"; "various related labels"; mandatory language for a can warning label; alternate warning label language; and other documents produced in discovery.  (*Id.*)

Dr. Sugarman explained that "[p]roduct labels are the most effective hazard mitigation technique in [an] environment [with associated risks].  It is the role of the manufacturer to ensure that the on-product warnings are effective, and that safety procedures are thoroughly explained." (*Id.* at ECF 10.)  For a warning to be effective, it

> must be noticed, read, and understood.  To be understood, a warning should inform the user what the hazard is, how to avoid the hazard, and what the consequences may be if the warning is not heeded.  With that information the user may accept the risk or choose to not use the product.

(*Id.* at ECF 12.)  Dr. Sugarman noted that while "[i]t is often difficult to establish if a warning was sufficiently noticeable," Lucita's "deposition testimony clearly indicates that she noticed, read,

and understood the information that was provided in the warning." (*Id.*)  Dr. Sugarman opined

that the issue with the label was not whether the warning was noticeable, but "the insufficiency of

defining the hazard, how to avoid the hazard, and the consequences." (*Id.* at ECF 14.)  Dr.

Sugarman explained that although the label warns that the product is flammable and can burst if

left near a heat source or near a stove, and not to store the product above 120 degrees, "it would

be unusual for a consumer to know how elevated the temperature may be in likely places to keep

the container in a kitchen." (*Id.*)  According to Dr. Sugarman, "[t]he warning does not connect the

concepts that release of contents caused by bursting may result in a spray of ignited product if

sufficiently hot" and it "is not intuitive that contents venting/expelling from the container may

catch fire so one may reasonably believe that normal use of the product would not pose a threat of

fire." (*Id.*)  Moreover, Dr. Sugarman posits, "a major defect in the warning is the failure to define

what is meant by 'near'" when it instructs the "consumer to avoid spraying it on a hot surface."

(*Id.*)  Dr. Sugarman further observed that the warning label does not advise the consumer that the

bottom of the can is designed to burst open if the internal pressure becomes too high because of

heat, and the consumer is not warned that the contents will spray out of the vents, and could catch

fire, if the vents are opened." (*Id.*)  Finally, "[t]he consumer is not given any indication of how

serious the consequences may be if the container fails catastrophically whether or not the contents

catch fire." (*Id.* at ECF 15.)  For these reasons, Dr. Sugarman concluded that "[a] consumer such

as [Lucita] who notices and reads the warning is not given sufficient information to understand the

true dangers of using this product and the risk that they face." (*Id.*)  Dr. Sugarman also found that

"Conagra does not have a unified procedure to develop warnings for their variety of products that

provides a consistent best practice label." (*Id.*)

Dr. Sugarman ultimately opined that the deficiencies in the PAM cannister label at issue led to the explosion:

> Whether the hazardous contents are released via bursting or venting, consumers are subjected to a hazard the severity of which they may not be aware of. The warning label on the original PAM container is especially deficient compared to other related or competing products in failing to specifically define the mode of failure, sufficient detail to avoid the hazard, the consequences of a failure, and the potential severity.

> It is my opinion to a reasonable scientific certainty that the cause of this accident was the lack of critical information that would have directed [Lucita], a demonstrated reader of product labels, to store her container of PAM at a safer distance from sources of heat, or perhaps to decide the product was too hazardous or inconvenient to have in her home.

(*Id.* at ECF 18.)

## B.    Dr. Lester Hendrickson

Plaintiffs' counsel also retained Dr. Lester Hendrickson, Ph.D., who testified at the *Daubert* hearing, to render an opinion about the design of the same type of PAM cannister that exploded in this case. Dr. Hendrickson completed his undergraduate and master's degrees in metallurgical engineering at Michigan Technological University, and his Ph.D. in metallurgical engineering with a minor in physics at the University of Illinois, Urbana, in 1969. (Hendrickson Resume, Dkt. 87-1, at ECF 83.) He has worked at Arizona State University in various professorial capacities in the Engineering Science, Mechanical and Aerospace Engineering, and Material Science and Engineering departments since 1968, and has been a professor emeritus there since 1995. (*Id.*) He has authored more than 1,000 technical reports as an expert witness. (*Id.* at ECF 84.) Although Dr. Hendrickson has been offered as an expert in other PAM or ConAgra cooking spray cases, he has never previously testified in court, nor has he come under a *Daubert* challenge. (Tr., Dkt. 107, at 40:8–10.)

9

Dr. Hendrickson completed the expert report in this case on June 25, 2018.  (Hendrickson Expert Report ("Hendrickson Rep."), Dkt. 87-1, at ECF 2.)  In preparing the report, he "reviewed several documents, photographs[,] and depositions provided by Plaintiff's counsel . . . [and] relied upon documents, photographs[,] and depositions received and reviewed in lawsuits involving exploding PAM aerosol cooking oil cans of identical or substantially similar design, size and construction" manufactured or distributed by Defendants.  (*Id.* at ECF 3.)  Dr. Hendrickson described his report as addressing three specific issues.  (*Id.* at ECF 4.)

> [The first] is when these "U" shaped features open and allow the contents to escape when the can functions as designed, do the highly flammable contents, which includes the propellant A70, which is a mixture of highly combustible gases propane and butane, escape at such a rapid rate that there is no prior notice to the user that the contents are escaping, and the ignition of the flammable contents occurs so rapidly and forms a ball of flame, that the user has no time to react.  If so, then the issue of whether the can is "venting" or "bursting" from the perspective of the consumer, is irrelevant.

> The second issue is related to the design and manufacturing specifications, and the allowable dimensional tolerances to these specifications.  Are the tolerances so narrow that it is likely some cans are allowed to be manufactured out of tolerance, and if so, the structure of the can is altered to the extent that rather than opening at the intended design pressure of 180 [pressure of pounds per square inch ("psig" or "PSI")], and at a temperature of $130^0$F, do in fact, open at a lower pressure and temperature.  Cans that perform in this manner contain a manufacturing defect.

> A third issue is whether the introduction of these "U" shaped scores into the bottom end of the can is of any value with respect to consumer safety.  The DOT Standards applicable to the design of the can apply to issues of the transportation of limited quantities of compressed gases, and have no relation to consumer safety.  The cans at issue contain PAM cooking oil spray, and therefore are expected to be used in the environment of a kitchen, which necessarily contains a heat source, often the ignited burners of a gas stove.

(*Id.*)  In further describing the third issue, Dr. Hendrickson differentiated an original DOT 2Q[8] can from one with "U" shaped scores at the bottom, noting that "from a consumer perspective" those

---

[8] The performance specifications for the "DOT 2Q can" are defined in 49 C.F.R. § 173.306.  This Department of Transportation ("DOT") regulation outlines the quantity and pressure

scores "expose the user to a hazard that does not exist in identical DOT 2Q cans absent 'U' shaped

scores in the bottom and containing PAM Original[.]"  (*Id.* at ECF 4–5.)

Dr. Hendrickson identified "[t]he most important parameter in identifying the root cause

of the explosion" as "the temperature to which the contents of the can were heated when used as

described by Ms. Urena."  (*Id.* at ECF 6.)  He explained that "the pressure inside of the can is a

direct function of the temperature reached by the contents, and the physical evidence shows

conclusively that internal pressure caused the subject can to explode."  (*Id.*)  The "function of a

can . . . is to retain its contents."  (*Id.* at ECF 8.)  When the can failed to function it "burst," burning

Lucita.  (*Id.*)  If that occurred at an internal pressure of 180 psig, rather than the minimum pressure

of 270 psig, as required by 49 C.F.R. § 173.306, then, according to Dr. Hendrickson, the can does

not meet the design specifications required under the regulations.  Dr. Hendrickson opined that

> [t]he defendants, by introducing so called "vents" in the bottom of the can altered
> the design of the can, so that the contents escaped at an internal pressure of 180
> psig, and a temperature of 130$^0$F.  Based on the chemical nature of the propellant
> [A70,] . . . it is a certainty that if the escaping contents encounter an ignition source,
> an explosion will occur.  Absent these "vents" the contents would have been safely
> contained within the subject can. . . .  There is no doubt that the temperature required
> to reach 270 psig is much higher than the 130$^0$F necessary for the pressure to reach
> 180 psi, at which [pressure] the so called "vents" are designed to open.

(*Id.* at ECF 9.)

Dr. Hendrickson analyzed DS Containers' patent application for the can and the impact of

the specifications for "venting."  (*Id.* at ECF 19–27.)  He concluded that the entirety of the contents

of the can would escape in 0.39 seconds if the vents are activated, a rate so high, "[for] the time

for the entire contents including the highly inflammable vapor phase of the propellant to escape

---

permitted for different containers that hold limited quantities of compressed gases.  *Id.*  The
regulation also describes how these containers should be packaged and the methods of testing that
must be utilized before and after filling.  *See id.*

completely from the can, that it offers no chance whatsoever for a consumer to avoid severe burn injuries in the event the so called 'venting' system activates." (*Id.* at ECF 21.) Dr. Hendrickson also contrasted the venting system for DS Containers' can with that of a DOT 2Q can without "U" shaped scores on the bottom, to note that with respect to the latter, if the can reaches a pressure of 230 psig the "bottom everts from concave to convex" and "lose[s] its stability and tip[s] over because it has a rounded bottom." (*Id.* at ECF 22–23.) In that instance, the contents of the can are retained safely within it and the tipped can alerts the user to an overpressure condition, allowing the user to safely move away. (*Id.*) By contrast, when a can with the "U" shaped venting system "vents" or "burst[s]," "the highly flammable vapor phase of the propellant, as well as the liquid PAM cooking oil, escape into the kitchen air in an extremely short time," and will "ignite into a fire-ball when an ignition source is encountered" without allowing the user to safely move or escape. (*Id.* at ECF 24.)

Dr. Hendrickson then discussed the effect on dimensional variances on product performance. (*Id.* at ECF 27–30.) After describing a finite elemental analysis, Dr. Hendrickson concluded that

> small reasonable variations from the design dimensions . . . or the depth of the scores, and in the strength specifications for the metal are likely to exist in the final manufactured product that reduce the internal pressure at which the "U" shaped scores open to a value much lower than 180 psig, thereby producing a can defective by manufacture.

(*Id.* at ECF 30.) The design of the can, according to Dr. Hendrickson, allowed "effectively no margin for safety from a consumer safety perspective." (*Id.*)

At the *Daubert* hearing, Dr. Hendrickson, in response to questions from the Court, reiterated his theory of causation:

> [F]rom my perspective, as an engineer, absent the vents in this can, the circumstances under which Ms. Urena was burned would not have occurred. And

the logic for that is that regardless of why this can exploded, I see no evidence she wasn't using it in a reasonably foreseeable manner.  Now, because the vents are in the can, the pressure at which the can will vent its contents and allow the contents to escape, which is the real hazard in this case, is much, much lower than it would be absent the vents.  So whatever circumstances existed that caused this can to vent and the contents to ignite, under the conditions in which it was being used by Ms. Urena would not have happened if the vents were not there.  And, consequently, the vents themselves are the direct cause of this explosion.

(Tr., Dkt. 107, at 15:5–19.)   The Court questioned Dr. Hendrickson's explanation and asked

whether he was "mixing" "a manufacturing issue or some other cause with the design."  (*Id.* at

16:14–16.)  More specifically, the Court asked:

> You agree that the can was designed to withstand temperature of up to 130 [degrees] and a psi of 180.  We also all agree that the can appears to have vented, and Ms. Urena has testified as to circumstances that should not have given rise to venting, if she is to be believed, because the temperature should not have gotten up to 130 [degrees].  She said she was holding the can, as you noted, so that would have been impossible if [the temperature] had gotten that high.
>
> So[,] the only logical conclusion is not a design defect, but, rather, . . . the can was not manufactured in the way it was designed.  In other words, it wasn't manufactured according to the design specifications, or else it should not have vented under the circumstances Ms. Urena described.  Is that not correct?

(*Id.* at 16:17–17:6.)  Dr. Hendrickson replied that he

> would go one step further and say, absent the vents, the can – the incident would not have occurred. . . .  Because the amount of pressure required to cause the can to burst and the mechanism by which this burst occurs is so different if the vents are not there, than if they are there, that I believe the primary cause of this incident was the design defect in the can, and that design defect is the introduction of these four vents in the bottom.

(*Id.* at 17:7–17.)

The Court then asked Plaintiffs' counsel about Dr. Hendrickson's proposed alternative for

the propellant A70, the current highly flammable propellant used in cans of PAM (*id.* at 17:19–

19:13), noting that, in his expert report, Dr. Hendrickson "does not propose an alternative, but

merely says that the designer of the product should develop a propellant that meets the performance

requirements of the PAM original aerosol can" (*id.* at 17:20–18:1), and that there is no evidence that the proposed nonflammable propellant used in other products, like Reddi-wip, is suitable for an oil product (*id.* at 18:5–21).

The Court also identified causation as an issue with Plaintiffs' claims, noting that "[t]here is no way under Ms. Urena's testimony that that can got up to 130 degrees or 180 [psig].  And that's what the can was designed to withstand before it vented." (*Id.* at 28:6–8.)  The Court asked Plaintiffs' counsel how, using the testimony of Plaintiffs' expert, they could "show causation" if the "triggering conditions" identified by Dr. Hendrickson "were never realized [and c]ould not have been realized if the jury accepts Ms. Urena's testimony." (*Id.* at 30:4–7.)  Dr. Hendrickson responded to the Court's concerns by explaining that his "opinion is that the incident that injured Ms. Urena occurred under some circumstance that we're not sure about.  However[,] . . . had the vents not been in this can, that explosion would not have occurred under that same set of circumstances." (*Id.* at 32:20–24.)  Moreover, Dr. Hendrickson explained,

> [w]hat we do know is that the way the can is designed, under whatever the circumstances were, the vents [were] going to open and release the contents, and lead to this explosion at a pressure far less and at a temperature far less than what would be required if the vents were absent.
>
> So, I can be certain that the vents – the presence of the vents are what was – what was responsible for this can allowing the contents to escape.  In the absence of vents, regardless of what the circumstances were, the contents would not have escaped under that same set of circumstances. . . .
>
> It would have been . . . scientifically impossible for the contents to vent under those same circumstances, absent the vents in the bottom of the can.

(*Id.* at 33:5–20.)

### C.     Dr. Russell Ogle

Defendant's engineering expert, Dr. Russell A. Ogle, Ph.D., submitted an expert report outlining his engineering analysis and rebuttal opinions to Dr. Hendrickson.  (*See* Expert Report

of Dr. Russell A. Ogle ("Ogle Rep."), Dkt. 101-1, at ECF 95–122.)   Dr. Ogle reached nine

conclusions:

1.  The fire scene and evidence in this case were not properly documented, analyzed, or preserved.

2.  There is insufficient evidence to establish a credible ignition sequence for the fire.

3.  The cause of the fire is undetermined.

4.  PAM cans [or DS Containers cans of the same design as the PAM can at issue] that are stored in accordance with the label's instructions will not reach the designed venting pressure.

5.  A can of the same design as the PAM can at issue left near an operating burner is unlikely to reach the designed venting pressure.

6.  The conditions necessary to cause the DS Containers can to reach the designed venting pressure are inconsistent with the testimony and statements of Plaintiff Lucita.

7.  It is reasonable to use a hydrocarbon propellant in consumer aerosol products. Use of a hydrocarbon propellant is not evidence of a design defect.

8.  Dr. Hendrickson lacks sufficient evidence to establish that a design or manufacturing defect caused the fire.

9.  The set of conditions necessary for venting outlined by Dr. Hendrickson in his finite element analysis are inconsistent with the testimony of Plaintiff Lucita.

(*Id.* at ECF 122.)

## DISCUSSION

**I.** ***Daubert* Motion**

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

F.R.E. 702.

"The proponent of the expert testimony has the burden to establish these admissibility requirements, with the district court acting as a 'gatekeeper' to ensure that the 'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *In re Pfizer Inc. Secs. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 150, 152 (1999) (applying the gatekeeping obligation to scientific testimony in addition to "technical" or "other specialized" knowledge); *Daubert*, 509 U.S. at 597.  "Important to this inquiry is that a district court 'focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions.'" *Kurtz v. Kimberly-Clark Corp.*, 414 F. Supp. 3d 317, 330 (E.D.N.Y. 2019) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)).  "In a products liability case, the 'touchstone' of an expert's report should be a comparison of the utility and cost of the product's design and alternative design," which "should usually be supported by testing of the alternative design."  *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 244 (E.D.N.Y. 2014) (internal citations omitted) (collecting cases).

The "test for reliability is 'flexible'" and "a trial judge may, but need not, consider the specific factors identified in *Daubert*."  *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004) (quoting *Kumho Tire Co.*, 526 U.S. at 149).  Those factors include: "(1) whether a theory or

technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a high known or potential rate of error; and (4) whether it is generally accepted in the relevant scientific community." *Id.* (quoting *Kumho Tire Co.*, 526 U.S. at 149–50); *see also Daubert*, 509 U.S. at 592–94. In *Zaremba*, the Second Circuit provided the framework for considering the *Daubert* factors when analyzing an expert's report and testimony regarding a safer alternative design. The Circuit found that the testimony of plaintiffs' expert about a safer alternative design did not satisfy any of the four *Daubert* factors because the expert had not tested his design, the design had not been subjected to peer review or publication, the design did not have a "known rate of error" since it had not been tested, and the expert failed to show general acceptance of either his design or methodology. *Zaremba*, 360 F.3d at 358; *see id.* at 358–59 (collecting cases supporting the proposition that "[n]umerous courts have excluded expert testimony regarding a safer alternative design where the expert failed to create drawings or models or administer tests").

Dr. Hendrickson's proffered design-defect testimony[9] fails to meet the *Daubert* test for

_____

[9] Defendants first argue that Dr. Hendrickson is not qualified to testify about the use of vents or the use of a flammable propellant in the design of the product at issue. (*See* Defendants' *Daubert* Motion, Dkt. 86, at 6.) While the Court does not exclude his testimony on that basis, it expresses serious doubts about whether Dr. Hendrickson has the appropriate credentials to opine on the matters at issue in this case. Of the "more than one thousand investigations in which he has participated since his retirement," approximately four hundred of which reached the deposition stage (Professional Experience of Dr. Hendrickson, Dkt. 87-1, at ECF 94), only seven involved analysis "substantially similar" to the issues involved in this case (Substantially Similar Cases, Dkt. 87-1, at ECF 96–97). While Dr. Hendrickson has never been excluded as an expert witness, he has also never been qualified as an expert in this area (*see* Tr., Dkt. 107, at 43:16–18). The Court does not credit Dr. Hendrickson's testimony that a general metallurgical engineering degree is sufficient to offer expertise on a myriad of designs, from canisters to designing a bridge. (*Id.* at 44:7–10.) However, Dr. Hendrickson does have some knowledge and experience that could assist a jury at arriving at a determination, *Vicuna v. O.P. Schuman & Sons, Inc.*, 298 F. Supp. 3d 419, 441 (E.D.N.Y. 2017), and "[d]isputes as to the strength of an expert's credentials, faults in his use of different etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony, *Cates v. Trs. Of Columbia Univ.*, No. 16-CV-6524 (GBD)

reliability and relevancy for the same reasons articulated in *Zaremba*.  First, Dr. Hendrickson fails

to explain how his proposed alternative design is a safer alternative.  Dr. Hendrickson proposes

that Defendants manufacture and use a DOT 2Q can without "U" shaped scores at the bottom and

without using a flammable propellant.  Dr. Hendrickson maintains that "although this option does

not eliminate the potential for explosion of the can, it does significantly reduce the probability of

the can doing so."  (Hendrickson Rep., Dkt. 98-1, at ECF 37–38.)  Dr. Hendrickson explains that

in the case of the DOT container without the "U" shaped scores, "[t]he high internal pressure of

357 psig, and temperature of $190^0$F . . . would most likely require some form of abuse or misuse

[to explode]."  (*Id.* at ECF 38.)  However, as Dr. Hendrickson acknowledges in his report, the

accident in this case was not caused by the allegedly faulty design of the DS Containers' can:

> In the instant Urena case, as well as numerous substantially similar cases, the
> circumstances under which the cans exploded leads to the conclusion that more
> likely than not, the temperature at which the can exploded was below $130^0$F, which
> means, since the maximum allowable pressure for a DOT 2Q can at $130^0$F is 180
> psig, that these cans exploded at an internal pressure of less than 180 psi.  If one
> assumes that a can designed as described by the applicable patent, when
> manufactured properly, will not buckle, and the scores will not open, until the
> internal pressure reaches 180 psig, it is the opinion of this author that the subject
> PAM cooking spray can in the Urena matter, and cans in all substantially similar
> incidents, were defective in manufacture.

(*Id.* at ECF 39.)  Thus, by Dr. Hendrickson's own admission, his proposed alternative *design* of

using the DOT 2Q can without "U"-shaped vents, on its own, would have made no actual

difference with respect to the accident at issue here and therefore cannot be found to be a safer

alternative.  *See Zaremba*, 360 F.3d at 359 ("[T]o provide relevant testimony, [the expert] must

also establish that his hypothetical design would have resulted in greater safety in the [ ] accident

at issue."); *Florentino v. Am. Lifts and REM Sys., Inc.*, No. 06-CV-3553 (BMC) (MDG), 2008 WL

───────────────────────

(SDA), 2020 WL 1528124, at *6 (S.D.N.Y. March 30, 2020) (quoting *McCullock v. H.B. Fuller
Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).

11417177, at *6 (E.D.N.Y. Apr. 15, 2008) ("[F]or expert testimony on design defect to be relevant, not only must it offer [a] feasible alternative design, but the expert must also establish that his hypothetical design would have resulted in greater safety in the accident at issue." (internal quotation marks, citation, and alterations omitted)).[10]

Moreover, Dr. Hendrickson offers no evidence demonstrating that his proposed alternative design meets any of the *Daubert* standards for reliability, as articulated in *Zaremba*.  Dr. Hendrickson also opines that the PAM product was defectively designed because it uses a flammable propellant and that "[i]f none of the available non-flammable propellants meet the performance requirements of the PAM Original aerosol cans, then the designer of the product should develop a propellant that does, or change the performance requirements."  (*Id.* at ECF 37.) However, Dr. Hendrickson does not actually propose a safer propellant, nor has he tested any. "The touchstone of an expert's report should be a comparison of the utility and cost of the product's design and alternative designs." *Zsa Zsa Jewels, Inc. v. BMW of N. Am., LLC*, 419 F. Supp. 3d 490, 509 (E.D.N.Y. 2019).  Dr. Hendrickson did not do any such comparison; his suggestion is purely speculative.  Moreover, Dr. Hendrickson's proposal has not been subjected to peer review or publication, the design does not have a "known rate of error" since it has not been tested, and he fails to show general acceptance of either his design or of his methodology.  *See Zaremba*, 360 F.3d at 358–59; *see also Lara v. Delta Int'l Mach. Corp.*, 174 F. Supp. 3d 719, 736 (E.D.N.Y. 2016) (collecting cases for proposition that a "utility versus cost comparison should entail the testing of any proposed alternative design" when analyzing a proposed alternative design and

---

[10] Moreover, to the extent Dr. Hendrickson bases his design-defect opinion on the purported absence of any "margin for safety" with respect to the thickness of the can's bottom (*see* Hendrickson Rep., Dkt. 87-1, at ECF 30), the Court notes that he has not identified an existing can in the marketplace that meets those criteria, nor has he tested or designed one.  That proposal does not pass muster under *Daubert*.  *Cf. Zsa Zsa Jewels, Inc.*, 419 F. Supp. 3d 514–16.

concluding that "[w]ithout properly testing his alternative theory, [the expert]'s conclusions are bottomed upon nothing more than mere speculation and guesswork, which are a less than adequate basis to support [the expert]'s position—especially since performing detailed studies and tests represents the touchstone of what an engineering expert in a design defect case should do" (internal quotation marks and citations omitted)); *Pierre v. Hilton Rose Hall Resort & Spa*, No. 14-CV-3790 (VMS), 2016 WL 1228604, at *3 (E.D.N.Y. Mar. 28, 2016) (collecting cases for proposition that testing, although not a prerequisite for the admissibility of expert testimony, is "critical" in design defect cases).   Thus, Dr. Hendrickson's proposed alternative design does not meet the standard for admissibility.

For all of the reasons discussed herein, the Court grants Defendants' motion to exclude Dr. Hendrickson's report and testimony pursuant to *Daubert*.[11]

## II.    Summary Judgment[12]

### A.    Legal Standard

Summary judgment is appropriate where the submissions of the parties, taken together,

---

[11] Defendants also argue that Dr. Hendrickson's conclusions concerning whether the PAM canister meets the DOT regulations are irrelevant and unsupported by evidence. (Defendants' *Daubert* Motion, Dkt. 86, at 8–10.)  Plaintiffs do not respond to this argument in their opposition brief.  (*See generally* Plaintiffs' Response to *Daubert* Motion, Dkt. 95.)  The Court agrees with Defendants that such testimony is irrelevant.  At his deposition, Dr. Hendrickson explained that "[t]he intention of those [DOT] standards is to create a safe condition for shipping the can.  [They have] absolutely nothing to do with consumer protection or consumer safety[;] . . . the DOT standards have nothing to do with venting."  (Hendrickson Dep., Dkt. 87-2, at 108:24–109:11.)  Plaintiffs simply do not put forth any evidence or theory that connects the DOT standards to any issues in this case.  Even if Dr. Hendrickson's testimony would be admissible under *Daubert*, his conclusions with respect to the DOT regulations are irrelevant to this case and are therefore inadmissible under Federal Rule of Evidence 401.

[12] Defendants contend that if summary judgment is not granted on the merits, then it should be granted as a sanction for an "extreme case of spoliation."  (Defendants' Motion for Summary Judgment ("Defs.' SJ Br."), Dkt. 91, at 21.)  Even if, as discussed *supra*, the Court was not granting summary judgment on the merits, it would not do so as a sanction for spoliation.  "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's

"show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party.  *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).  Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial.  *Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]."  *Hayut v. State*

---

use as evidence in pending or reasonably foreseeable litigation."  *West v. Goodyear Tire and Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (citation omitted); *see also Hoefer v. Bd. of Educ. of the Enlarged City Sch. Dist. Of Middletown*, 820 F.3d 58, 61–62 (2d Cir. 2016) (reiterating the holding in *West*).  The Court has a number of remedies available to it, and while "[o]utright dismissal of a lawsuit is within the court's discretion," *West*, 167 F.3d at 779 (alterations omitted), "dismissal is a drastic remedy," and "should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions," *id.* (internal quotation marks omitted); *see also Matteo v. Kohl's Dep't Stores, Inc.*, 533 F. App'x 1, 3 (2d Cir. 2013) (summary order) (A district court has "wide discretion in determining the nature and amount of sanctions.").  Although, "[e]ven where the spoliator has acted with mere negligence, it is well-established that, as between a negligent party and an innocent party, the former has no right to retain the fruits of their misconduct," *Ungar v. City of New York*, 329 F.R.D. 8, 15 (E.D.N.Y. 2018), "[t]raditional sanctions for spoliation [may also] include preclusion, monetary sanctions, or an adverse inference instruction," *Richard v. Dignean*, 332 F.R.D. 450, 467 (E.D.N.Y. 2019) (quoting *Liberman v. Fedex Ground Package Sys., Inc.*, No. 09-CV-2423 (RML), 2011 WL 145474, at *5 (E.D.N.Y. Jan. 18, 2011).  Plaintiffs have already been forced to withdraw many of their claims as a result of the spoliation, and outright dismissal on the basis of spoliation would therefore be unwarranted.

*Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (internal quotation marks omitted) (alteration in original).  In other words, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (internal quotation marks and emphasis omitted).  In determining whether a genuine issue of fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  The Court also construes any disputed facts in the light most favorable to the nonmoving party.  *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157–60 (1970).  However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson*, 477 U.S. at 247–48 (emphasis omitted).  The Court need only consider admissible evidence when adjudicating a motion for summary judgment, and "should not consider testimony of an expert it has found to be unreliable in evaluating a motion for summary judgment."  *Hilaire*, 54 F. Supp. 3d at 251 (citing *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir.1998)).

**B.      Plaintiffs' Claims**

New York law recognizes three types of defect claims: (1) design defects; (2) manufacturing defects; and (3) defective or inadequate warnings.  *Voss v. Black & Decker Mfg. Co.*, 450 N.E.2d 204, 207 (N.Y. 1983); *see also McCarthy v. OlinCorp.*, 119 F.3d 148, 154–55 (2d Cir. 1997).  In this case, Plaintiffs claim that design defects and a failure to provide adequate warnings caused Lucita's injuries.

1.      Design Defect

A defectively designed product is "one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use."  *Robinson v. Reed-Prentice Div. of Package Mach. Co.*, 403 N.E.2d 440, 443

(N.Y. 1980); *see also Oden v. Boston Sci. Corp.*, 330 F. Supp. 3d 877, 888 (E.D.N.Y. 2018) ("A defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce." (quoting *Scarangella v. Thomas Built Buses, Inc.*, 717 N.E.2d 679 (N.Y. 1999)).

"In design defect cases, the alleged product flaw arises from an intentional decision by the manufacturer to configure the product in a particular way." *Zsa Zsa Jewels, Inc.*, 419 F. Supp. 3d at 506 (quoting *Denny v. Ford Motor Co.*, 662 N.E.2d 730, 736 n.3 (N.Y. 1995)). The test "'is whether a reasonable alternative design would, at reasonable cost, have reduced the foreseeable risk of harm posed by the product and, if so, whether the omission of the alternative design by the seller or a predecessor in the distributive chain rendered the product not reasonably safe.'" *Id.* at 507 (quoting Restatement § 2 cmt. d). Put another way, "[a] claim premised upon a defective design theory requires that Plaintiff show: (1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing Plaintiff's injury." *Oden*, 330 F. Supp. 3d at 888.

Moreover, complex cases in which "[l]ay jurors simply are not equipped with the relevant background knowledge" "require[] an expert opinion as to defect and as to feasible alternative design." *Water Pollution Control Auth. of the City of Norwalk v. Flowserve US, Inc.*, 782 F. App'x 9, 15 (2d Cir. 2019) (summary order) (internal quotation marks and citation omitted). When the plaintiff does not present any "admissible expert evidence as to design defect or feasible alternative design, its products liability claims necessarily fail." *Id.* That is the situation here.

Plaintiffs' design-defect claims fails on the first two prongs of this test. With respect to

the first inquiry—whether the product as designed posed a substantial likelihood of harm—Plaintiffs fail to offer admissible evidence that it was the design of the PAM can that caused Lucita's injuries, and not a purported manufacturing defect.  As discussed *supra* in the context of Defendants' *Daubert* challenge, there is no relevant or reliable expert testimony that the can's design caused the accident.  Even if Dr. Hendrickson's testimony is admissible, his conclusions do not support Plaintiffs' design defect theory.  In his report, Dr. Hendrickson describes cooking simulation tests performed by him and by other experts in the field.  (*See* Hendrickson Rep., Dkt. 98-1, at ECF 13–15; *see also* Appendix D to the Hendrickson Report, Dkt. 98-1, at ECF 99–127 (incorporating cooking simulation tests performed by other experts).)  Dr. Hendrickson determined:

> The results of the cooking simulation tests, as they apply to the Urena case, show that there is no reasonable scientific probability, that the subject PAM can, located at a distance of at least 12.5 inches from the gas burners while Ms. Urena was cooking steak, beans and rice, was heated to a temperature approaching $130^0$F. . . .
>
> These cooking simulation test results indicate, in general, that a PAM Original can containing "U" shaped scores on the bottom is highly unlikely to reach a temperature of $130^0$F, or the corresponding maximum allowable pressure of 180 psig, when placed in close proximity to a gas burner during a normal cooking process, even if the time to which the can is exposed to heat is hours.  Therefore[,] it is highly unlikely that the location, relative to the burner of a gas stove, a user of PAM Original cooking spray oil places the can during the cooking process causes or contributes to the cause of an explosion of the can.

(Hendrickson Rep., Dkt. 98-1, at ECF 14–15.)  Dr. Hendrickson's analysis notes that it is "highly unlikely" for the can at issue to burst or vent, and points to a theoretical manufacturing defect claim,[13] and *not* to a design defect claim.  Under the conditions testified to by Lucita, based on the

---

[13] In order to establish liability for a manufacturing defect claim, "the plaintiff must show that a specific product unit was defective as a result of some mishap in the manufacturing process itself, improper workmanship, or because defective materials were used in construction, and that the defect was the cause of plaintiff's injury."  *Oden*, 330 F. Supp. 3d at 890 (internal quotation marks and citations omitted).  "A manufacturing flaw exists when the unit in question deviates in

scientific analysis done by Plaintiffs' own expert, the design of the can should not and would not have resulted in the venting of the can.

Plaintiffs also fail with respect to the second element, requiring them to propose a feasible alternative design. Plaintiffs, relying on Dr. Hendrickson's testimony, propose that Defendants eliminate the use of the A70 flammable propellant and/or utilize a DOT 2Q can without U-shaped vents at the bottom. (*See* Plaintiff's Memorandum of Law in Opposition to Summary Judgment ("Pls.' SJ Br."), Dkt. 97, at 22–26.)

Plaintiffs' proposal for Defendants to use a standard DOT 2Q can without vents—a can that was previously in use to sell the same product—fails. While a proposed alternative design that was previously used in conjunction with the product at issue plainly is a feasible suggestion, Plaintiffs fail to explain whether that "design would, at reasonable cost, have reduced the foreseeable risk of harm posed by the product and, if so, whether the omission of the alternative design by the seller or a predecessor in the distributive chain rendered the product not reasonably safe." *Zsa Zsa Jewels, Inc.*, 419 F. Supp. 3d at 507 (internal quotation marks and citation omitted). "This analysis is rooted in a recognition that there are risks and benefits associated with many products and that there are instances in which a product's inherent dangers cannot be eliminated without simultaneously compromising or completely nullifying its benefits." *Id.* at 507–08 (internal quotation marks and citation omitted). Plaintiffs do not put forth any relevant expert testimony or analysis as to the risks and benefits of using the alternative can or explaining whether the alternative design would have enabled Lucita to avoid injury. Indeed, Dr. Hendrickson's own

---

quality and other performance standards from all of the other identical units." *Id.* (internal citation and alteration omitted).

analysis indicates that the design of the PAM can at issue should have enabled Lucita to avoid injury, since it was designed to withstand pressure up to 180 psi at a temperature of $130^0$F, conditions that could not have existed at the time of the accident if the can was properly manufactured, according to both her and Dr. Hendrickson's testimony.  (*See* Hendrickson Rep., Dkt. 87-1, at ECF 38–39.)  Additionally, even assuming that Dr. Hendrickson's testimony was not excluded, neither Plaintiffs nor their expert identify a specific propellant to replace the one currently in use.  They suggest that if Defendants cannot replace the propellant with another "packaged in the same type of vented, two[-]piece can" that meets their performance requirements then "they should have developed a propellant that did, or otherwise change those requirements." (Pls.' SJ Br., Dkt. 97, at 25.)  However, suggesting that a crucial element of a product be changed without proposing a clear alternative is insufficient for a proposed alternative design.  *See Greenberg v. Larox, Inc.*, 673 F. App'x 66, 70 (2d Cir. 2016) (summary order) (noting that, in *Felix v. Akzo Nobel Coatings Inc.*, 262 A.D.2d 447, 449 (N.Y. App. Div. 1999), the Appellate Division affirmed a decision for defendant "in part because there was no competent evidence set forth by the plaintiff that there was an alternative, safer design of a solvent contained in defendant's products" (internal quotation marks omitted)); *Cf. Hilaire*, 54 F. Supp. 3d at 248–49 ("[A] plaintiff cannot satisfy his burden to propose a feasible alternative design by proposing that an entirely different product could have been used.").

Thus, the Court finds that Plaintiffs' expert has not proffered a reasonable alternative to the product's current design, and Plaintiffs have not submitted an opinion of an alternative expert to support their design-defect claims.  Without such expert testimony, "Plaintiffs [are] unable to sustain their burden of proving that the [PAM product] was, in fact, defective." *Lara*, 174 F. Supp. at 741 (finding that New York law requires the testimony of an expert witness, *i.e.*, testimony that

is "beyond the ken of the average layperson," to prove a design's defectiveness); *see id.* (collecting cases).  In light of Plaintiffs' lack of expert evidence to show design defect, there exists no genuine issue of material fact, and Plaintiffs' claims based upon the allegedly defective design of the PAM can at issue must fail as a matter of law.

2.   Failure to Warn

"Pursuant to New York law, a plaintiff may assert that a product is defective because the manufacturer failed to provide adequate warnings regarding the risks and dangers associated with the use, or foreseeable misuse, of its product."  *Oden*, 330 F. Supp. 3d at 891 (internal quotation marks and citation omitted).  "The failure to provide warnings gives rise to liability not only against the manufacturer, but against the distributor and retailer as well."  *Reece v. J.D. Posillico, Inc.*, 83 N.Y.S. 3d 672, 676 (App. Div. 2018) (internal citation and alterations omitted).  To establish liability for failure to warn,

> a claimant must show: (1) that a manufacturer has a duty to warn; (2) against dangers resulting from foreseeable uses about which it knew or should have known; and (3) that failure to do so was the proximate cause of harm.  As part of satisfying those elements, a plaintiff is required to prove that the product did not contain adequate warnings. . . .  There are several important considerations that directly affect the adequacy of a warning, including the location and conspicuousness of the warning and the method in which the warning is communicated to the ultimate user.

*Quintana v. B. Braun Med. Inc.*, No. 17-CV-6614 (ALC), 2018 WL 3559091, at *5 (S.D.N.Y. July 24, 2018) (internal quotation marks and citations omitted).  "Moreover, a manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known.  This duty is a continuous one, and requires that the manufacturer be aware of the current information concerning the safety of its product."  *McGrath v. Bayer Healthcare Pharm., Inc.*, 393 F. Supp. 3d 161, 171 (E.D.N.Y. 2019) (internal quotation marks and citation omitted).  "New York courts evaluate a warning's language for its accuracy, clarity[,] and relative consistency, inquiring into whether the warning is correct, fully descriptive[,] and complete."

27

*Fleming v. Endo Int'l PLC*, No. 18-CV-4866 (GBD), 2019 WL 4378964, at *3 (S.D.N.Y. Aug. 27, 2019) (internal quotation marks and citation omitted); *see also Martin v. Hacker*, 628 N.E.2d 1308, 1313 (N.Y. 1993) ("[T]he court should evaluate the [warning]'s language for its accuracy, clarity[,] and relative consistency."). Although "[c]laims regarding the adequacy of a warning are normally fact-specific and are usually best reserved for trial," summary judgment may be granted "[w]hen a warning raises no triable questions of fact as to adequacy." *Jiang v. Ridge Tool Co*, 764 F. App'x 43, 45 (2d Cir. 2019) (summary order). The Court finds that to be the case here.

Plaintiffs cannot establish that Defendants' alleged failure to warn was the proximate cause of Lucita's injuries. "Proximate cause requires proof that the inadequate warning was a 'substantial factor in bringing about the injury[.]'" *Whalen v. CSX Transp., Inc.*, No. 13-CV-3784 (LGS), 2017 WL 4075200, at *3 (S.D.N.Y. Sept. 13, 2017) (quoting *Doomes v. Best Transit Corp.*, 958 N.E.2d 1183, 1191 (N.Y. 2011) (alterations omitted)). According to Plaintiffs' own expert, Dr. Sugarman, Lucita's "deposition testimony clearly indicates that she noticed, read, and understood the information that was provided in the warning." (Sugarman Rep., Dkt. 98-2, at ECF 12.) At the same time, Dr. Sugarman explained that while the label on the PAM can warns that the product is flammable and can burst if left near a heat source or near a stove, and not to store the product above 120 degrees, "it would be unusual for a consumer to know how elevated the temperature may be" in those places where the container would likely be kept in a kitchen. (*Id*. at ECF 14.) However, Lucita's own testimony, Dr. Hendrickson's report and testimony, and Plaintiffs' admissions all indicate that she used the product consistent with the warning label, *i.e.*, she did not hold or place the can "near" the stove or any other heat source, or store the can at a temperature above 120 degrees. (*See* Pls.' 56.1, Dkt. 96, ¶¶ 8–9 (admitting that the can was stored in a kitchen cupboard, estimated by Plaintiffs' expert to be "at least 12 inches, and likely more

than 18 inches, from the stove"); *id.* ¶ 13 (admitting that the can was not hot when Lucita was holding it, even though it was a hundred degrees that day, inside and outside her apartment).)[14] Thus, Plaintiffs cannot show that any alleged inadequacy in the warning label—*e.g.*, not advising the consumer of the precise distance at which to keep the can from the stove or heat source or the precise conditions under which a can might heat up to 120 degrees—caused the explosion or Lucita's injuries.  Moreover, even if Lucita, in fact, placed the can on or near the flame, Plaintiffs' own expert, Dr. Sugarman, agreed that the existing label was adequate to warn a consumer not to do so.  (*See* Deposition of Dr. Sugarman, Dkt. 101-1, at 128:16–20, 130:12–14.)

Plaintiffs' theory that the warning was inadequate because it did not specifically warn that the can's contents would vent through holes in the bottom if overheated fails for the same reason.

---

[14] To the extent that Defendants rely on Lucita's purported statements to hospital personnel that suggests that she placed the PAM can on or near the stove, as contained in her medical records (*see* Defs.' SJ Br., Dkt. 91, at 20), the Court need not, and does not, rely on that evidence, which is arguably inadmissible hearsay, *see Borzon v. Green*, 778 F. App'x 16, 19 (2d Cir. 2019) (summary order) ("[A] party cannot rely on inadmissible hearsay in opposing a motion for summary judgment absent a showing that admissible evidence [corroborating the hearsay] will be available at trial." (citing *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985))).  Federal Rule of Evidence 803(4) contains a hearsay exception for statements "made for—and []reasonably pertinent to—medical diagnosis or treatment; and . . . [that] describe[] medical history; past and present symptoms or sensations; their inception; or their general cause." F.R.E. 803(4).  The Advisory Committee Notes specify "that, while 'statements of the patient's condition are exempted from the hearsay rule because of the patient's strong motivation to be truthful in order to obtain the appropriate diagnosis and treatment,' statements that go beyond causation and assign fault for a medical condition are not excepted." *Johnson v. Mauro*, No. 16-CV-622 (BKS) (DEP), 2019 WL 2336070, at *5 (N.D.N.Y. June 3, 2019) (alterations omitted) (quoting, *inter alia*, Advisory Comm. Notes, 1972 Proposed Rules); *cf. Berman v. Mobil Shipping and Transp. Co.*, No. 14-CV-10025 (GBD), 2019 WL 1510941, at *5 (S.D.N.Y. Mar. 27, 2019) (finding statements in medical records about past asbestos exposure admissible as hearsay exception when that exposure was directly linked to medical diagnosis).  In this instance, Plaintiff's statements about the placement of the can arguably "go beyond causation" and are therefore unrelated to the medical diagnosis.  In any event, the other evidence proffered by Plaintiffs, including, most notably, Lucita's own deposition testimony, amply establishes that she did not place the PAM can on or near the stove or heat source before the explosion.

Plaintiffs argue that "identical cooking sprays that were also sold in vented spray cans during the relevant time actually included express warnings that the product was designed to 'vent' its contents through holes in the bottom if overheated" (Pls.' SJ Br., Dkt. 97, at 30), and that "the record contains no reasonable explanation as to why this important information was missing from the subject PAM Original cooking spray" (*id.* at 31).  Even assuming that a manufacturer's use of a certain warning for similar products is relevant to the adequacy of a product's warning label—a proposition for which Plaintiffs provide no legal support—Plaintiffs still cannot show that the absence of this warning about venting caused Lucita's injuries.  Plaintiffs' contention that if the label had specifically warned of the possibility of venting, Lucita could have "chosen not to use the product at all," thus demonstrating a causal connection between the proposed alternative label and the accident, borders on the absurd.  No reasonable jury could find that a warning that the can might vent its contents if overheated would have been more likely to cause a consumer, like Lucita, not to buy or use the PAM product, than the label that was already on the can, which warned:

> USE ONLY AS DIRECTED.  *FLAMMABLE.  DO NOT SPRAY ON HEATED SURFACES OR NEAR OPEN FLAME.*  NEVER SPRAY DIRECTLY INTO OVEN.  REMOVE BROILER PANS FROM OVEN BEFORE SPRAYING.  CAN MAY *BURST* IF LEFT ON STOVE OR NEAR HEAT SOURCE.  AVOID SPRAYING IN EYES.  *CONTENTS UNDER PRESSURE.*  DO NOT PUNCTURE OR INCINERATE.  DO NOT STORE ABOVE $120^0$F.  KEEP OUT OF REACH OF CHILDREN.

(Defs.' 56.1, Dkt. 90, ¶ 5 (italics added).)  Knowing that a can might "burst" clearly would be as, if not more, likely to prompt a consumer not to use the PAM product as a warning that the can "was designed to 'vent' its contents through holes in the bottom if overheated."  Indeed, the fallacy of Plaintiffs' argument is demonstrated by Lucita's own conduct.  She bought and used the product notwithstanding the existing label's explicit warnings about the flammability of the can's contents and the possibility that it could "burst" if overheated.

Accordingly, because Plaintiffs cannot meet their burden to establish proximate causation between the warning label and the alleged incident, the Court grants summary judgment to Defendants on Plaintiffs' failure-to-warn claim.  *Cf. Reece*, 83 N.Y.S.3d at 676–77 (affirming defendants' entitlement to judgment as a matter of law when the warning would not have changed the behavior of plaintiff, and thus "the failure to warn . . . was not a substantial cause of the events which produced the injuries alleged here").[15]

## C.     Loss of Consortium

Although Defendants do not expressly move for summary judgment on Plaintiff Jose's loss of consortium claim (Amended Complaint, Dkt. 30, ¶¶ 97–100), they purported to file a "dispositive motion," which the Court construes to include *all* of Plaintiffs' claims (*see* Defs.' SJ Br., Dkt. 89).  "A claim for loss of consortium or services is a derivative action, and in the common law of New York, does not exist independent of the injured spouse's right to maintain an action for injuries sustained."  *Bertini v. Smith & Nephew, Inc.*, 8 F. Supp. 3d 246, 260 (E.D.N.Y. 2014) (internal quotation marks and citation omitted).  Since Lucita's claims are dismissed, the Court dismisses Jose's derivative claim for loss of consortium.

## CONCLUSION

For the reasons contained herein, the Court grants Defendants' *Daubert* motion to exclude the report and testimony of Plaintiffs' expert, Dr. Lester Hendrickson, and grants Defendants' dispositive motion for summary judgment on Plaintiffs' design-defect and failure-to-warn claims.

---

[15] Though the lack of causation is sufficient to grant summary judgment, the Court notes that the lack of evidence demonstrating that the PAM can's label inadequately warned "against dangers resulting from foreseeable uses about which [Defendants] knew or should have known," *Quintana*, 2018 WL 3559091, at *5, likely would have warranted the grant of summary judgment for Defendants as well.

The Court also dismisses Plaintiff Jose Urena's derivative claim for loss of consortium.  The Clerk

of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

_/s/ Pamela K. Chen_
Pamela K. Chen
United States District Judge

Dated:  June 1, 2020
        Brooklyn, New York